The BOARD OF COUNTY COMMISSIONERS OF MUSKOGEE COUNTY, Oklahoma, Plaintiff–Appellant,

v.

The CITY OF MUSKOGEE, Defendant–Appellee.

The BOARD OF COUNTY COMMISSIONERS OF MUSKOGEE COUNTY, Oklahoma, Plaintiff–Appellee,

v.

The BOARD OF EDUCATION OF MUSKOGEE PUBLIC SCHOOLS, DISTRICT I–20, Defendant–Appellant.

Nos. 72761, 72748.

Supreme Court of Oklahoma.

Nov. 5, 1991.

Norman D. Thygesen, Asst. Dist. Atty., Muskogee County, Muskogee, for appellant in No. 72,761 and appellee in No. 72,748, Board of County Com'rs of Muskogee.

Steven Cousparis, Robert DuPriest, City Attorney's Office, Muskogee, for appellee in No. 72,761, City of Muskogee.

Julian K. Fite, Muskogee, for appellant in No. 72,748, Board of Educ. of Muskogee Public School Dist. I–20.

J.I.M. Caldwell, Oklahoma City, for amicus curiae in Nos. 72,761 and 72,748, Ass'n of County Com'rs of Oklahoma, Inc.

Robert H. Macy, Dist. Atty., Hugh A. Manning, Asst. Dist. Atty., Oklahoma County, Oklahoma City, for amicus curiae in Nos. 72,761 and 72,748, Board of County Com'rs of Oklahoma County, Okl.

Diane Pedicord, Sue Ann Nicely, Oklahoma City, for amicus curiae in No. 72,761, Oklahoma Mun. League, Inc.

OPALA, Chief Justice.

Three questions are tendered in appeal No. 72,761: [1] Does the statute-mandated program of revaluation of taxable county property[1] impose a duty on a recipient municipality of ad valorem tax revenues to pay its share of the revaluation cost? Should this question be answered in the affirmative, then [2] Does the county excise board also have a statute-imposed obligation to make ad valorem millage for payment of these costs available to a municipality? and [3] Do the provisions of 68 O.S.1981 § 2481.4,[2] when applied to a municipality, contravene our constitutional or statutory law? We answer the first question in the affirmative, and the last two in the negative.

The question tendered in appeal No. 72,748 is whether the terms of § 2481.4, which

---

1. 68 O.S.Supp.1984 §§ 2481.1 et seq. The statutory scheme here under consideration was repealed in 1988, eff. July 1, 1992 (Ok.Sess.L.1988, Ch. 162, §§ 165 and 166); *for further explanation see infra* notes 2 and 15. The statutory revaluation regime that is to govern after July 1, 1992 is codified in 68 O.S.Supp.1988 §§ 2820 et seq. of the Ad Valorem Tax Code, 68 O.S.Supp. 1988 §§ 2801 et seq.

2. The pertinent terms of 68 O.S.1981 § 2481.4 *provided:*

 "The cost of the comprehensive program of revaluation shall be paid by those who receive the revenues of the mill rates levied on the property of the county in the following manner: The county assessor shall *prepare a special budget* for such comprehensive program of revaluation and file the same with the county equalization and excise board. That *board shall apportion such cost among the various recipients of revenues from the mill rates levied, including* the county, all cities and towns, *all school districts* and *all sinking funds* of such recipients, in the ratio which each recipient's total tax proceeds collected from its mill rates levied for the preceding year bears to the total tax proceeds of all recipients from all their mill rates levied for the preceding year. Such amounts shall be included in or added to the budgets of each such recipient, including sinking funds, and the mill rates to be established by the board for each such recipient for the current year shall include and be based upon such amounts. Then the board and *each such recipient shall appropriate* the said amounts to the county assessor for expenditure for the comprehensive program of revaluation." (Emphasis added.)

 The legislature twice amended this statute in 1988 (Okl.Sess.L.1988, Ch. 90, § 9, eff. July 1, 1988, and Ch. 162, § 153, eff. July 1, 1989) and then repealed it eff. July 1, 1992 (Okl.Sess. L.1988, Ch. 162, § 166). The statute was again amended in 1989 (Okl.Sess.L.1989, Ch. 321, § 5, eff. July 1, 1989) and in 1991 (Okl.Sess.L.1991, Ch. 249, § 34, eff. July 1, 1991). The 1991 version stands repealed eff. July 1, 1992 (Okl. Sess.L.1991, Ch. 249, § 5). *See* 68 O.S.Supp. 1991 § 2823 of the Ad Valorem Tax Code for the statutory regime of revaluation cost apportionment that will become eff. July 1, 1992.

make the recipient entities of ad valorem tax revenues responsible for paying the property revaluation program's cost, violate any provisions of Art. 10 §§ 9,[3] 19[4] and 20[5] and Art. 5 §§ 46[6] and 59,[7] Okl. Const. Our answer to this question is in the negative.

# I

## THE ANATOMY OF LITIGATION

### A.

*Cause No. 72,761—The Claim For Costs Against The City*

In compliance with the statutory regime, Muskogee County proceeded in 1983 with a comprehensive program to revaluate all property within the county. The Board of County Commissioners [Commissioners] billed the City for its proportionate share of the revaluation costs for the 1983-84 fiscal year. The county excise board approved the City's payment of this expense from its excess revenues in the 1983-84 sinking fund budget. When the following

year the excise board approved a request to levy millage for the City's 1984-85 sinking fund budget to pay the City's share of revaluation costs, some utility-taxpayers challenged the action by suit. The Court of Appeals held the levy contravened the terms of Art. 10 § 28, Okl. Const.,[8] which restrict the sinking fund use to payment of interest coupons, bonds and judgments. *See Matter of Protests of Southwestern Bell.*[9] Faced with this decision, the excise board ceased making appropriations of ad valorem tax millage to the City's sinking fund budget for the revaluation expenses, although the City continued to be billed for its share of the program costs. *The controversy now before us was occasioned by the City's refusal to pay its proportionate share of the revaluation program for three fiscal years—1984-85 through 1986-87.*

The Commissioners sought mandamus[10] compelling the City to meet its statute-imposed obligation to pay the revaluation costs for the three fiscal years in contest.[11]

3. The terms of Art. 10 § 9, Okl. Const., provide in part:
 "(a) * * * No ad valorem tax shall be levied for State purposes, nor shall any part of the proceeds of any ad valorem tax levy upon any kind of property in this State be used for State purposes. * * *"

4. The terms of Art. 10 § 19, Okl. Const., are:
 "Every act enacted by the Legislature, and every ordinance and resolution passed by any county, city, town, or municipal board or local legislative body, levying a tax shall specify distinctly the purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose."

5. The terms of Art. 10 § 20, Okl. Const., are:
 "The Legislature shall not impose taxes for the purpose of any county, city, town, or other municipal corporation, but may, by general laws, confer on the proper authorities thereof, respectively, the power to assess and collect such taxes."

6. The pertinent terms of Art. 5 § 46, Okl. Const., are:
 "The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law authorizing:
 * * * * * *
 Regulating the affairs of counties, cities, towns, wards, or school districts; * * *"

7. The terms of Art. 5 § 59, Okl. Const., provide:
 "Laws of a general nature shall have a uniform operation throughout the State, and where a general law can be made applicable, no special law shall be enacted."

8. The provisions of Art. 10 § 28, Okl. Const., are:
 "Counties, townships, school districts, cities, and towns *shall levy sufficient additional revenue to create a sinking fund* to be used, first, for the payment of interest coupons as they fall due; second, for the payment of bonds as they fall due; third, for the payments of such parts of judgments as such municipality may, by law, be required to pay." (Emphasis supplied.)

9. Okl.App., 727 P.2d 108 (1986).

10. Mandamus may issue by the district court. See 12 O.S.1981 § 1451, *infra* note 22.

11. The City was billed $46,385 for the fiscal year 1984-85 as partial payment for the systematic program of revaluation. For the fiscal years 1985-86 and 1986-87, the City was billed $5,140.17 and $6,395.02, respectively.

 Neither the City nor the school district questions the amount of the revaluation cost that was apportioned to it. *It is not the quantum but the legality of the obligation that is in dispute.*

The City countered that (a) the excise board failed to allocate any funds to the City's budget for payment of these costs and (b) any legal requirement to pay for the program from revenue independently generated either from city taxes or from the City's sinking fund violates certain provisions of state fundamental law.

### B.

### Cause No. 72,748—The Claim For Costs Against The School Board

The Commissioners also pressed a mandamus claim against the Board of Education of Muskogee Public Schools, District I-20 [School Board] to compel payment of the 1986–87 fiscal-year revaluation costs.[12] *The School Board, which had paid its share for the fiscal years 1983–84 through 1985–86, denied liability for the 1986–87 fiscal year.* Its position was that (a) the excise board failed to allocate any funds to the School Board budget to defray this expense and (b) any legal requirement to use for the revaluation program funds specifically budgeted "for educational purposes" is constitutionally impermissible.

During the fiscal years in contest the county assessor prepared a special budget for the revaluation costs, which the excise board assessed against the City and School Board in proportion to those entities' share in the total ad valorem tax revenue. Neither the City's general fund nor its sinking fund contained a separate appropriation for payment of revaluation cost. The City sub-

mitted only its sinking fund budget to the excise board for review and approval of a share of the millage rates available for sinking funds.[13] The School Board's estimated budget, like that of the City, contained *no* separate or identifiable appropriation for its share of revaluation costs.

Upon consolidation of the two mandamus proceedings for a single trial, the district court ordered that mandamus issue against the School Board but not against the City. The ruling rests on the legal conclusion that (a) the statute-imposed revaluation program is constitutional and (b) the revaluation program does not constitute a "state purpose". The City was found not liable for its assessed share of the costs based on the judge's view that (a) § 2481.4 [14] contemplates the revaluation cost would be paid by ad valorem tax revenues themselves, (b) the City's general fund received no specific millage appropriation for this purpose and (c) the City's use of the sinking fund millage to finance the revaluation program would be constitutionally impermissible. From this order the School Board and the Commissioners brought separate appeals, which stand consolidated for disposition by a single opinion.

## II

### THE AD VALOREM TAX REVALUATION PROGRAM

The enactment of ad valorem tax revaluation program introduced a comprehensive

---

**12.** The School Board was billed $61,962.19 for its share of the 1986–87 fiscal year revaluation costs.

**13.** The City's budget procedures are governed by the Municipal Budget Act, 11 O.S.1981 §§ 17-201 et seq. Section 17–207 provides that the budget adopted by a municipality's governing body shall be filed with the county excise board and that its sinking fund needs shall be determined in accordance with Art. 10 § 28, Okl. Const., *supra* note 8, 62 O.S.1981 § 431 and 68 O.S.Supp.1984 § 2497 (recodified as 68 O.S.Supp.1988 § 3017, Okl.Sess.L.1988, Ch. 90, § 11, eff. Jan. 1, 1992). Section 2497 provides that when the county excise board ascertains

the total assessed valuation of the property taxed ad valorem in each municipal subdivision and computes the total of the several items of appropriation for general fund, sinking fund and other legal purposes for each municipal subdivision, it shall then compute the levy for each fund of the municipality. Under § 431 it is the duty of each municipality's taxing officials (those authorized by law to levy taxes) to make a levy each year for a sinking fund. Section 431 was amended in 1991 (Okl.Sess.L.1991, Ch. 73, § 2). *The amendment has no effect on this litigation.*

**14.** For the pertinent terms of 68 O.S.1981 § 2481.4, *see supra* note 2.

statewide regime for all taxable properties within every county of the State.[15] Section 2481.1 [16] commands that revaluation process be carried out on a continuous basis and be conducted at least once each five years. All county assessors are given the responsibility to ensure that all property is revaluated. They are required to submit a special budget for the revaluation cost to the county excise board, which must review and approve the special budget.[17] The excise board must then apportion the cost among the diverse recipients of ad valorem tax revenues.[18] The apportionment is to be based upon the ratio that each recipient's total tax proceeds (collected from its mill rates levied for the preceding year) bear to the total proceeds of all the recipients' levied mill rates.[19] *Every ad valorem millage recipient is required to pay its proportionate share of revaluation costs.*[20]

## III

## MANDAMUS

■ Mandamus, an extraordinary legal remedy,[21] is governed by the terms of 12 O.S.1981 §§ 1451 and 1452.[22] Before a writ may issue there must be found (1) a clear legal right in the petitioner, (2) the respondent's refusal to perform a plain non-discretionary legal duty and (3) the writ's appropriateness as a legal remedy and the inadequacy of other relief.[23]

## IV

## THE CITY HAS A STATUTE–IMPOSED DUTY TO PAY ITS SHARE OF THE REVALUATION COSTS

The City, which asserts that the legislatively mandated equalization and revaluation program should be viewed as an exclusive state-controlled activity,[24] directs our

---

**15.** The terms of 68 O.S.Supp.1984 § 2481.1 provided in pertinent part:

"Each county assessor shall commence ... no later than January 1, 1969, a *comprehensive program of revaluation of all taxable property* within his respective county. Such program shall progress at a rate which will result in the revaluation of all taxable property within the county before January 1, 1972. Each assessor shall thereafter maintain *an active and systematic program of revaluation on a continuous basis,* and shall establish a revaluation schedule which will result in revaluation of all taxable property within the county *at least once each five (5) years....*" (Emphasis added.)

The legislature amended this statute in 1988 (Okl.Sess.L.1988, Ch. 162, § 152, eff. Nov. 1, 1988) and then repealed the 1988 version eff. Jan. 1, 1992 (Okl.Sess.L.1988, Ch. 162, § 165). See 68 O.S.Supp.1988 § 2820 for the comprehensive program for the "individual visual inspection of all taxable real property" within each county, eff. Jan. 1, 1991; *see also* 68 O.S.Supp. 1991 § 2821, which pertains to the physical inspection of real property as a part of the visual inspection cycle, eff. Jan. 1, 1992.

**16.** *Supra* note 15.

**17.** *See* 68 O.S.1981 § 2481.4, *supra* note 2.

**18.** *See* 68 O.S.Supp.1984 § 2481.1, *supra* note 15; 68 O.S.1981 § 2481.4, *supra* note 2.

**19.** *See* 68 O.S.1981 § 2481.4, *supra* note 2.

**20.** *See* 68 O.S.1981 § 2481.4, *supra* note 2.

**21.** *State v. Oklahoma Public Welfare Comm'n,* 196 Okl. 586, 167 P.2d 71, 72 (1946); *Witt v. Wentz,* 142 Okl. 128, 286 P. 796, 797 (1930); *see also Woolen v. Coffman,* Okl.Cr., 676 P.2d 1375, 1377 (1984); *Oklahoma Gas & Elec. v. District Court, Okl.,* 784 P.2d 61, 63 (1989); *Morton v. Adair County Excise Bd.,* Okl., 780 P.2d 707, 709 (1989).

**22.** The terms of 12 O.S.1981 § 1451 provide in pertinent part:

"The writ of *mandamus may be issued* by the Supreme Court or the district court ... to any inferior tribunal, corporation, board or person, *to compel the performance of any act which the law specially enjoins as a duty,* resulting from an office, trust or station; *but* though it may require an inferior tribunal to exercise its judgment or proceed to the discharge of any of its functions, it *cannot control judicial discretion.*" (Emphasis added.)

The terms of 12 O.S.1981 § 1452 are:

"This writ may not be issued in any case where there is a plain and adequate remedy in the ordinary course of the law. It may be issued on the information of the party beneficially interested."

**23.** *McDonald v. Oklahoma Real Estate Commission,* Okl., 268 P.2d 263, 264 (1954); *Witt v. Wentz, supra* note 21, 286 P. at 797; *see also Woolen v. Coffman, supra* note 21 at 1377. Mandamus will issue to compel performance of a mandatory duty. *State v. Holder,* Okl., 279 P.2d 1098 (syllabus 2) (1955).

**24.** This argument is pressed by the amicus brief filed by the Oklahoma Municipal League, Inc.

attention to the statutory text which provides that the program is established, supervised and directed by the State Board of Equalization[25] and is to be carried out as an exclusive duty of the county assessor.[26] Relying on *State ex rel. Dept. of Human Serv. v. Malibie*[27] and *State ex rel. Jordan v. City of Bethany,*[28] the City asserts the test of "municipal purpose"—as distinguished from "state purpose"—calls for measuring the municipality's degree of "control" over the program. Any benefit to the City from the revaluation process, the City urges, falls beneath the constitutional minimum gauge for qualifying as a municipal purpose.[29] According to the argument, the duty to fund the revaluation function under review cannot be legislatively imposed on a municipality unless the state surrenders its control over the program. Even if the program did satisfy a *municipal purpose,* the City claims that neither cities nor towns can be required to fund state or county programs over which the municipality wields no control. For the reasons to be explained, we reject the position advanced by the City.

## A.

## THE MALIBIE AND JORDAN HOLDINGS

■ *Malibie* stands as authority for the principle that, where the state assumes control over an activity that is not an exclusive state service, the legislature cannot require a county to contribute funds toward the support of a state-created program. There, the court struck down as constitutionally infirm[30] a state statute that required county commissioners and members of county excise boards to appropriate millage to a state-controlled *crippled children's program administered by a state agency and managed by state officers.* The court observed that while counties may have a constitutional obligation to provide for crippled children within their boundaries, it is for the counties to decide how those services are to be provided.

■ *Jordan* teaches that the legislature may not *explicitly* create municipal liability for state performance of a service that is directly related to some state function and thus *shift to the city its own funding obligation,* either in whole or in part. There, the controversy was occa-

**25.** See [a] Art. 10 § 21, Okl. Const., which establishes the State Board of Equalization and defines its functions—to adjust and equalize the valuation of real and personal property; [b] 68 O.S.Supp.1985 §§ 2463 and 2464, which establish the identity of state board members as well as its powers, duties and authority and [c] 68 O.S.Supp.1985 § 2464 and 68 O.S.1981 § 2481.-10, which mandate the State Board to supervise administration of the equalization process. These statutes were repealed in 1988 (Okl.Sess. L.1988, Ch. 162 § 165 eff. Jan. 1, 1992); the statutory regime that is to govern after Jan. 1, 1992 is found in 68 O.S.Supp.1990 §§ 2864 and 2828. *The repealing acts have no effect on this litigation.*

**26.** See 68 O.S.Supp.1989 § 2435 and 68 O.S.Supp.1988 § 2494 for the duties of the county assessor. The terms of 68 O.S.Supp.1983 § 2416 require the county assessor to report directly to the State Tax Commission. The assessor is also required by 68 O.S.Supp.1984 § 2481.1, *supra* note 15, and 68 O.S.1981 § 2481.6 to comply with the procedures and standards established by that taxing entity. These statutes were repealed eff. Jan. 1, 1992 (Okl.Sess.L.1988, Ch. 162, § 165); the statutory regime that will govern after Jan. 1, 1992 is

found in 68 O.S.Supp.1989 § 2818 and 68 O.S.Supp.1988 §§ 2820, 2825 and 3014.

**27.** Okl., 630 P.2d 310 (1981).

**28.** Okl., 769 P.2d 164 (1989).

**29.** The City asserts that Art. 10 § 14, Okl. Const., does not permit cities and towns to spend their revenues for a mere "benefit". The terms of § 14 provide in pertinent part:

"Taxes shall be levied and collected by general laws, and for public purposes only...."

**30.** The court held in *Malibie, supra* note 27, that the contested statutory provision, 10 O.S.1971 § 175.11, which required that county ad valorem tax revenues be appropriated to fund the crippled children's program, *constituted an appropriation of county ad valorem revenues for a state purpose in contravention of Art. 10 § 9, Okl. Const., supra* note 3. The court opined that while a state program may assist counties in discharging some of their responsibility, it does not empower the state to appropriate county funds for use in the state program. The court also found the statute to be violative of Art. 21 § 1, Okl. Const., which requires state funds to be expended to support and maintain state institutions.

sioned by the city's refusal to pay for autopsies performed on persons whose deaths within the city's municipal boundaries were deemed to be "unexplained." [31] The dispositive question settled by *Jordan* is that the legislature may not require a city to pay for an integral part of suspected felony homicide investigations. This expense is incidental to the state's performance of its *exclusive* function to prosecute for the commission of a felony. The cities have no power to bring felony prosecutions and cannot be mandated to pay any part of that function.[32] As invoked in *Jordan*, the *Malibie* element of "control" serves only to point out that *the city was impermissibly required to pay for a service unrelated to its own legal responsibility.*

In sum, *Malibie* and *Jordan* guard against legislative shifting of the funding burden from the state to counties or cities for state-controlled services or functions that are by law assigned to the state. The "control test" prohibits two different classes of activities: (a) *state-controlled*—those assumed activities that are state controlled, as in *Malibie,* and (b) *law-imposed*—those functions that are legally imposed on (not necessarily assumed by) the state, as in *Jordan.*

### B.

### THE CITY'S STATUTE–IMPOSED DUTY TO PAY FOR REVALUATION COSTS FOSTERS A MUNICIPAL PURPOSE

 The act of assessing, levying, collecting and distributing revenue is a legitimate subject of legislative regulation.[33] The county is governed by state law in the manner in which it raises and distributes ad valorem tax revenue. While the state can regulate this process, it cannot—because of express constitutional prohibition—allocate ad valorem tax revenue for the benefit of the state.[34] The revaluation process is not a "state function," *but rather an ongoing service activity performed by county officials for the express benefit of all those local entities which by law have a legitimate claim on some portion of ad valorem tax revenue.* It is designed to affect an existing ad valorem taxation scheme and to serve the lawful recipients of this revenue to assure them of fairness and efficiency in assessment and collection. A municipality retains *control* over its share of ad valorem tax revenue, but it lacks *control* over the process of producing the tax—the latter function belongs to the county and cannot be constitutionally claimed by the cities. In short, the revaluation regime neither offends nor contravenes the *Malibie* and *Jordan* mandate for "municipal control".

The City is a statutory beneficiary of ad valorem levies. Its lack of control over the tax assessment process does not make its cost liability constitutionally impermissible. It suffices that the City undeniably has an enormous stake in the product of the revaluation program.

### V

### OTHER ISSUES URGED BY THE CITY

### A.

The City urges that the legislature intended for *all* costs connected with assess-

---

**31.** The statute (63 O.S.Supp.1985 § 944.2) contested in *Jordan, supra* note 28, requires political subdivisions to pay a "fee" for autopsies performed by the office of State Medical Examiner.

**32.** The terms of 11 O.S.Supp.1983 § 14–111 provide in pertinent part:

 \* \* \* B. Cities having a municipal criminal court of record ... *shall not have authority to enact any ordinance making unlawful an act or omission declared by state statute to be punishable as a felony.*
 C. Municipalities having a municipal court not of record ... *shall not have authority to*

*enact any ordinance making unlawful any act or omission declared by state statute to be punishable as a felony. \* \* \*"* (Emphasis added.)
*The quoted language was not changed by a 1990 amendment, see Okl.Sess.L.1990, Ch. 141, § 1.*

**33.** *See* 68 O.S.1981 §§ 2401 et seq. (repealed by Okl.Sess.L.1988, Ch. 162 § 165 eff. Jan. 1, 1992). For the statutory regime that will govern the revaluation process by county assessors after Jan. 1, 1992, *see* 68 O.S.Supp.1988 § 2814 et seq. of the Ad Valorem Tax Code.

**34.** See the pertinent terms of Art. 10 § 9, Okl. Const., *supra* note 3.

ing, levying and collecting ad valorem revenue be paid from the proceeds levied by the county excise board for each ad valorem revenue recipient. For textual proof of this intent we are directed to specific language in § 2481.4.[35] Even if a municipality is obligated to pay for revaluation costs out of its general revenues, we are urged that this funding duty does not arise until after the excise board has made an ad valorem levy available to the municipality in an amount sufficient to pay its share of the revaluation cost.

The statutory language evinces legislative intent that once the revaluation cost is included in a recipient's budget, it is a legal and valid expenditure. Nowhere do we find either in § 2481.4 or in the statutory revaluation scheme that the legislature had intended for the excise board to increase a recipient's millage for that entity's reimbursement to the county of its assessed share. The clear intent of the statute is that *all taxable county property* be revalued at least once every five years. *All entities* deriving benefits from the ad valorem tax regime, either directly in the form of millage to a school district or indirectly through the use of millage to the sinking fund, are obligated to pay the cost of that continuing revaluation program.

Moreover, it is clear here that the ad valorem revenue raised through the re-

valuation process came to the City "already burdened"—by operation of law—with the statutory obligation to the County for a proportional share of costs and hence constituted a legitimate item of expense.[36] By the very legislative enactment that created the revenue-raising program, a burden came to be placed upon the tax receipts, to the extent of unencumbered surplus funds in the sinking fund, for the city's discharge of its obligation to pay the proportionate share. The City's obligation attached on its collection of revenue derived through the program; and its duty to pay from the revenue so burdened is unequivocal.

### B.

The City asserts that § 2481.4 contravenes Art. 5 §§ 46[37] and 59[38] and Art. 10 § 5,[39] Okl. Const., whose terms prohibit the enactment of special laws "regulating the affairs of counties, cities, towns." These constitutional provisions proscribe "special" laws that single out for different treatment less than an entire class of similarly situated entities.[40] Section 2481.4 is an impermissible special law, the City argues, similar to that which was struck down in *Oklahoma City v. Griffin.*[41] The City offers no tenable legal basis to support the notion that § 2481.4 is a constitutionally proscribed "special law." We are not informed *how* the City, as a subclass of

---

**35.** *See* 68 O.S.1981 § 2481.4, *supra* note 2.

**36.** See in this connection *United Oklahoma Bank v. Moss,* Okl., 793 P.2d 1359, 1363 (1990), where the court held that a wife's decree-conferred lien upon marital property is to be treated as analogous to a purchase money mortgage. This is so because, as in a purchase money mortgage situation, a prior estate comes to be transformed into a security interest and the transferee's (husband's) title comes *already burdened* with the lien in the transferor's (wife's) favor. Similarly here, the City's *receipt* of the burdened revenue raised through the revaluation program made these *receipts* encumbered (*to the extent of the sinking fund's unencumbered surplus*) with the obligation to pay the proportionate share of the cost.

**37.** For the pertinent terms of Art. 5 § 46, Okl. Const., *see supra* note 6.

**38.** *See supra* note 7 for the terms of Art. 5 § 59, Okl. Const.

**39.** The terms of Art. 10 § 5, Okl. Const., provide:

"The power of taxation shall never be surrendered, suspended, or contracted away. Taxes shall be uniform upon the same class of subjects."

**40.** *Reynolds v. Porter,* Okl., 760 P.2d 816, 822 (1988); *Maule v. Independent School Dist. No. 9,* Okl., 714 P.2d 198, 203 n. 30 (1985).

**41.** Okl., 403 P.2d 463 (1965). For a further discussion of this case *see* Part VI of this opinion. The City asserts the revaluation cost "is simply imposed based solely on the fact that the City ... had a sinking fund levy in a prior year which has no reasonable relationship either to the function of ongoing revaluation or the systematic schedule for revaluation of properties within the City ... as compared to cities and towns or parts of the county outside the corporate limits."

ad valorem tax recipients, is treated differently from other recipients of that levy. If the City is asserting that its statute-imposed obligation is at variance with the treatment accorded non-recipient cities and towns, we simply note that recipient and non-recipient municipalities are not "similarly situated" for application of the constitutional norm. For the reasons given in Part VI(C), we conclude that § 2481.4 does not violate our fundamental law.

■ Additionally, the City asserts that if it is required to pay the revaluation expense from general revenues, city taxpayers will bear a greater share of the cost than other residents of the county. As for any adverse effect the statute may have on city residents, we hold the City has no standing to raise this issue.[42] Standing must be predicated on an interest that is "direct, immediate and substantial."[43] A municipality is a revenue consumer, not a contributor. It does not have standing to press a taxpayer's complaint based on a statute's non-uniform effect. Any possible defensive use of these constitutional provisions by a city taxpayer as a bar to the City's payment of revaluation costs is at best conjectural. We do not sit to decide hypothetical issues or to give advisory opinions about issues not yet in controversy.[44] No corrective relief may hence be granted from some anticipated interposition of state fundamental law by municipal taxpayers.

### C.

The City asserts various arguments as to the invalidity of legislation that imposes a payment against municipal revenues that are currently budgeted and appropriated for the lawful expenses of city government. More specifically the City asserts that it would be improper to have it pay a claim for revaluation costs because it has no unencumbered funds on hand.[45]

The City's concerns about the validity of spending a portion of its general revenues to pay for the revaluation costs need not be addressed here since we conclude in Part VII of the opinion that an additional levy to the sinking fund is an appropriate method for paying this statute-imposed obligation in contest. None of the constitutional and statutory restrictions will thus be violated.

### VI

### THE SCHOOL BOARD'S CONSTITUTIONAL ARGUMENTS

#### A.

■ The School Board does not complain about the quantum of the total share it is called upon to pay. Rather, it seeks to avoid the statute-imposed obligation by raising several constitutional barriers. First, the School Board argues that § 2481.4 violates the provisions of Art. 10 § 19, Okl. Const.,[46] which require that the purpose for every tax levy be specified and that no funds collected may be diverted for another purpose. According to the School Board, the cited statute is unconstitutional because it "requires that tax funds levied and collected for school purposes ... be devoted to the purpose of running the Of-

---

**42.** *Matter of Estate of Doan,* Okl., 727 P.2d 574, 576 (1986); *Application of State ex rel. Dept. of Transp.,* Okl., 646 P.2d 605, 609 (1982); *Democratic Party of Oklahoma v. Estep,* Okl., 652 P.2d 271, 274 (1982); *State ex rel. Cartwright v. Okl. Tax Com'n,* Okl., 653 P.2d 1230, 1232 (1982); *Underside v. Lathrop,* Okl., 645 P.2d 514, 517 (1982); *Cleary Petroleum Corp. v. Harrison,* Okl., 621 P.2d 528, 530 (1980).

**43.** *Democratic Party of Oklahoma v. Estep, supra* note 42 at 274; *Matter of Estate of Doan, supra* note 42 at 576; *Cleary Petroleum Corp. v. Harrison, supra* note 42 at 530; *Application of State ex rel. Dept. of Transp., supra* note 42 at 609; *Underside v. Lathrop, supra* note 42 at 517.

**44.** *Underside v. Lathrop, supra* note 42 at 517.

**45.** The City relies on 62 O.S.1981 § 310.4, which provides that all unencumbered balances on hand at the close of June 30, may remain as a credit for the fiscal year up to September 30. The City further argues that its officials would be both civilly and criminally liable for paying revaluation costs from the current general fund for prior fiscal year expenses. Neither can a municipality incur a liability, the City adds, that is in excess of income provided for the current fiscal year in which the work is done.

**46.** For the pertinent terms of Art. 10 § 19, Const., *see supra* note 4.

fice of County Assessor." We find the argument unpersuasive.

Assuming that the statutory charge against the school district is a "tax" within the meaning of § 19, there is no dispute that the ad valorem millage rates allocated to the school district are strictly for educational purposes. The obligation imposed by the revaluation statute is *for the cost of the program responsible for determining those very rates.* This scheme manifests no constitutionally prohibited diversion of funds. The legislatively created arrangement for sharing the cost of revaluing property may be viewed as the School District's *quid pro quo.*[47]

### B.

■ Next, the School Board argues that § 2481.4 violates Art. 10 § 20, Okl. Const.[48] This provision prohibits the legislature from "impos[ing] taxes for the purpose of any county" but allows the lawmakers "by general law, [to] confer on the proper authorities ... the power to assess and collect such taxes." According to the School Board, § 2481.4 "create[s] a tax ... for the direct benefit of the county assessor, and, at the same time, put[s] the responsibility for determining the amount of such tax and its collection into the hands of the county assessor and excise board rather than the proper authority, the Defendant School Board." The School Board also claims that the revaluation statutes serve a "state" purpose and hence must be funded by the state. For the reasons stated in Part IV and to be stated in this portion of the opinion we reject these arguments.

The enactment's express terms clearly indicate that the *recipients* of ad valorem tax revenues, and not the county assessor, are the direct beneficiaries of the revaluation program. The county's receipt of School Board payment for the latter entity's share of the statutory program's cost can hardly be considered a "benefit" to the county. The county excise board is under a duty imposed by Art. 10 § 9, Okl. Const.,[49] to apportion *for school district purposes* at least five mills of "the total taxes for all purposes on an ad valorem basis...." and is prohibited from using the proceeds from any ad valorem tax levy for state purposes. Inasmuch as the express intent of § 2481.4 is to "maintain an active and systematic program of revaluation on a continuous basis," and to "establish a revaluation schedule" at least every five years,[50] the statute plainly serves *no state purpose* and confers *no "direct benefit"* upon the county assessor.

### C.

■ We find no merit in the School Board's remaining contention that the cited statute in question violates Art. 5 §§ 46[51] and 59,[52] Okl. Const. No tenable ground is offered for the School Board's notion that § 2481.4 is a constitutionally proscribed "special law."[53] The School Board merely complains that it "is being charged over $60,000.00 to pay for a system that reduced its funding by over $500,000.00," and that there is "no relationship" between the statutory obligation and "the funds derived from the ad valorem tax system."

The cases upon which the School Board relies are inapposite. In *School Dist. No.*

---

**47.** The School Board emphasizes that "[t]he county assessor, for the year in question, dropped the assessment ratio from 12% to 10½%, resulting in a decrease in ad valorem funds to Defendant Board of Education in an amount exceeding $500,000.00...." A change in circumstances, i.e., decreased property values, does not evince the fundamental-law infirmity asserted here.

**48.** *See supra* note 5 for the provisions of Art. 10 § 20, Okl. Const.

**49.** *Supra* note 3.

**50.** 68 O.S.Supp.1984 § 2481.1, *supra* note 15.

**51.** *See supra* note 6 for the pertinent terms of Art. 5 § 46, Okl. Const.

**52.** *See supra* note 7 for the provisions of Art. 5 § 59, Okl. Const.

**53.** *See also* the discussion of special laws in Part V(B), *supra.*

*85, Kay County v. School Dist. No. 71, Kay County* [54] a statute gave the excise board the authority to create an expense item for transfer fees in the school district's estimate of need. The court held that the enactment was a prohibited special law because it allowed the excise board to levy one expense item when all others were to be made by the school district's board. In *Oklahoma City v. Griffin* [55] this court struck down as constitutionally infirm the statute by which the driver education program was to be funded by a portion of the fines collected by *cities and counties* from traffic or city ordinance violations. The condemned legislation was held to be special law because it exempted *towns and villages* from the contribution requirement.

The statutes in each of the cases the School Board invokes created a conspicuous *subclass* intended for treatment at variance with that received by the class. *Here, the revaluation program treats all ad valorem tax recipients alike.* However different the budgetary impact of decreased property values may be upon the School Board, the revaluation statutes [56] themselves may not for that reason be viewed as "special". We find no constitutional infirmity in the fiscal policy regulation embodied in the enactment. [57] The School Board, like every other recipient, must contribute to the program *pro tanto.*

**54.** 135 Okl. 270, 276 P. 186, 190 (1928).

**55.** *Supra* note 41 at 464–465.

**56.** See *supra* notes 2 and 15.

**57.** In a June 26, 1970 opinion (No. 70–190) the Attorney General characterized § 2181.4 as a "declaration of fiscal policy" providing for payment of the program's cost by all its recipients.

**58.** For the pertinent terms of Art. 10 § 28, Okl. Const., see *supra* note 8.

**59.** *See* 19 O.S.1981 § 6; 62 O.S.1981 §§ 365.5, 365.6, 397 et seq., 431, 435.

**60.** (a) *County—State v. Moreland,* 152 Okl. 37, 3 P.2d 803, 810 (1931); *Tulsa County Excise Board v. Texas–Empire Pipe Line Co.,* 180 Okl. 287, 68 P.2d 861 (1937); *Hampton v. Hamilton Const. Co.,* 173 Okl. 282, 48 P.2d 273, 274 (1935); (b) *Municipality—Jones v. Blaine,* 149 Okl. 153, 300 P. 369, 370 (syllabus 8) (1931); (c) *School Dis-*

## VII

## A WRIT OF MANDAMUS COMMANDING THE SCHOOL DISTRICT AND CITY TO PAY REVALUATION COSTS IS THE FUNCTIONAL EQUIVALENT OF A JUDGMENT, WHICH THEN BECOMES A SINKING FUND OBLIGATION

Counties, school districts and cities are required by Art. 10 § 28, Okl. Const., [58] and statutory law [59] to create a sinking fund to be used for the payment of interest and principal on bonds and judgments entered against them. [60] A sinking fund is the only revenue source provided by law from which judgments against these entities may be satisfied. [61]

An order in mandamus commanding the performance of a valid statutory duty is the functional equivalent and the analogue of a judgment. [62] The very notion that a validly imposed statutory obligation could ever be defeated by a municipality's failure to include its amount in the annual budget is enough to show the fallacy of the City's position that *this mandamus order* may not operate here *qua* executable "judgment" within the meaning of 62 O.S.1981 § 431. [63] *Exclusion by municipal officials of a legitimate government expense item from a city's budget can neither defeat a statute-imposed burden nor immunize the City from liability for*

*trict—Wilson v. City of Hollis,* 193 Okl. 241, 142 P.2d 633, 640 (1943); *Board of Education of City of Drumright v. Board of County Com'rs of Creek County,* 171 Okl. 464, 43 P.2d 139, 140 (1935); *McMahan v. Board of Education,* 142 Okl. 110, 285 P. 953, 954 (1930).

**61.** *See State v. Moreland, supra* note 60, 3 P.2d at 810.

**62.** *In re Epley,* 10 Okl. 631, 19–20, 64 P. 18 (1901); *Braine v. City of Stroud,* Okl., 385 P.2d 428, 430 (1963); *see also State v. District Court of Mayes County,* Okl., 440 P.2d 700, 708 (1968); *Smiley v. City of Tulsa,* 159 Okl. 195, 14 P.2d 942 (1932).

**63.** Earlier in the opinion (Part VA) we applied the same principle to reject the contention that failure of the excise board to allocate the funds or to provide an additional levy would operate to defeat a valid statutory obligation.

*a validly incurred obligation.* None of the briefs convincingly argues for striking down as infirm the statute-approved formula for distribution of the revaluation expense among the various ad valorem tax users. We are hence constrained *(a) to treat it as a recoverable obligation and (b) to uphold its legislative imposition as not offensive to our constitutional regime.*

■ When, as here, there is a statute-imposed duty to pay revaluation costs, a writ which orders the payment of these costs represents a sinking fund obligation which may be paid either out of surplus revenues in the sinking fund or from three annual sinking fund levies.[64]

■ Mandamus lies here as an appropriate remedy. No adequate legal remedy exists to enforce the County's legal right to payment from the City and School Board for their share of revaluation costs.[65] The trial court's order in mandamus which grants the writ against the School Board is affirmed; that part which denies the writ against the City is reversed; the cause is remanded for further proceedings not inconsistent with this pronouncement.

HODGES, V.C.J., and LAVENDER, DOOLIN and HARGRAVE, JJ., concur.

SIMMS, ALMA WILSON and KAUGER, JJ., concur in part and dissent in part.

SUMMERS, J., dissents.

ALMA WILSON, Justice, with whom KAUGER, Justice joins, concurring in part and dissenting in part:

I concur with today's pronouncement that the ad valorem tax revaluation program is not a state function. The Oklahoma Constitution, Article 10, § 8, expressly authorizes the Legislature to enact laws "defining classifications of use for the purpose of applying standards to facilitate **uniform assessment procedures in this state.**" [Emphasis added.] However, neither § 8 nor any other constitutional provision authorizes an additional ad valorem tax levy to defray the costs of uniform assessments. Today's pronouncement that the writ of mandamus issued herein constitutes a judgment for payment of the involved expenses of revaluation and that judgment may be paid from ad valorem tax revenues held in sinking funds is contrary to the Oklahoma Constitution, Article 10, § 28. Accordingly, I respectfully dissent to Part VII of the opinion herein.

The maximum ad valorem tax millages, the purposes for the levies, and the entities entitled to levy taxes on property are strictly provided for in the constitution. The constitution prohibits the levy of ad valorem tax except as may be therein provided. Okla. Const., art. 10, § 9. The plain words of our constitution prevent either the Legislature or this Court from authorizing ad valorem tax levies in excess of those set forth in the constitution.

Levies of ad valorem taxes for sinking funds of various political subdivisions of the state are authorized by the Oklahoma Constitution, Article 10, § 28, which states:

Counties, townships, school districts, cities, and towns shall levy sufficient additional revenue to create a sinking fund to be used, first, for the payment of interest coupons as they fall due; second, for the payment of bonds as they fall due; third, for the payments of such parts of judgments as such municipality may, by law, be required to pay.

The express language of § 28 limits the use of revenues in sinking funds to the payment of specific debts: bonded indebtedness or judgment debts owed by the political subdivisions. Ad valorem tax levies needed to generate revenues to retire local indebtedness or to pay judgments may be imposed without a vote of the people. Okla. Const., art. 10, § 28. Underlying § 28 is the prerequisite approval of the electorate to create a debt, Okla. Const., art. 10, § 26, and, the need to preserve the

---

**64.** 62 O.S.1981 §§ 431, 435; *Board of Education v. Board of County Com'rs,* 171 Okl. 464, 43 P.2d 139, 140 (1935); *State v. Goerke,* 191 Okl. 1, 126 P.2d 1005, 1006 (1942).

**65.** For the critical elements of mandamus, *see Tulsa Tribune Co. v. Okl. Horse Racing Com'n,* Okl., 735 P.2d 548, 553 (1986).

integrity of judicial orders. Use of revenues in sinking funds to defray the ordinary expenses of political subdivisions is simply not within the ambit of § 28.

The Oklahoma Constitution, Article 10, §§ 9, et seq. authorizes ad valorem tax levies for ordinary expenses of political subdivisions. Generally, ad valorem tax levies in excess of the 34 mills authorized in subsections (a), (b) and (c) of § 9 must be approved by a vote of the electorate. Part VII authorizes levies in excess of the constitutional maximums and it defeats the right of the electorate to approve additional ad valorem tax levies, even if the levies were within the maximums. Further, Part VII is not critical to the preservation of the integrity of the judiciary. Part VII of the majority opinion, authorizing payment of the ordinary expenses of the defending political subdivision parties from their respective sinking funds under the guise of a "judgment", is contrary to the constitution.

The Court of Appeals in its published opinion in *Matter of Protests of Southwestern Bell Company v. Muskogee County Excise Board,* 727 P.2d 108 (Okla.App. 1986), declared the levy of ad valorem tax for the payment of the municipality's proportionate share of the expense of revaluation from its sinking fund to be illegal under the express language of the constitution, Okla. Const., art. 10, § 28. At issue in that appeal was the levy to pay the municipality's 1984–1985 revaluation expense involved herein. Part VII effectively vacates the Court of Appeals opinion in this collateral matter.

The propriety of the assessor's expenses of revaluation are not at issue herein. The issue is legal: Whether a school district or a municipality is legally obligated to pay a proportionate share of the county assessor's annual costs of performance of revaluation? The majority opinion resolves that legal issue in favor of the county and directs payment of the unchallenged expenses. The writ of mandamus directs payment of portions of the county asses-

sor's costs of revaluation from revenues in sinking funds. In essence, Part VII instructs the local ad valorem taxing entities to withhold payment of its ordinary annual expenses and force collection through judicial proceedings, thereby allowing payment from sinking funds. The constitution does not contemplate either the levy or the use of ad valorem tax revenues in sinking funds to defray annual expenses of political subdivisions of this state that have been reduced to judgment.

The Legislature impermissibly provided for payment of proportionate shares of the assessor's revaluation expenses from sinking funds in 68 O.S.1981, § 2481.4 and 68 O.S.Supp.1988, § 2823. Those impermissible laws have been corrected. In 1991, the Legislature amended §§ 2481.4 and 2823, expressly excluding sinking funds from the payment of the county assessor's revaluation expenses. 1991 Okla.Sess.Laws, ch. 124, § 34, and ch. 249, § 8.[1] This Court, as the final arbiter of our constitution, should mandate the municipality and the school district parties to pay the involved revaluation costs from their revenues appropriated for those ordinary operating expenses. Accordingly, I respectfully dissent in part.

SIMMS, Justice, concurring in part, dissenting in part:

I would affirm the trial court in all respects. The use of sinking funds to pay for revaluation costs is beyond the limits placed on those funds by Art. 10, § 28. Additionally, I agree with Justice Wilson that the majority's authorization of this payment from sinking fund revenues is not rendered permissible by its depiction of the obligation as now being a "judgment". That rationale is illusory and unconvincing.

---

**1.** The Legislature repealed 68 O.S.1981, § 2482.4, as amended by 1991 Okla.Sess.Laws, ch. 124, § 34. 1991 Okla.Sess.Laws, ch. 249, § 5. However, in the same bill, the Legislature amended 68 O.S.Supp.1988, § 2823, which contained the provisions of § 2481.4, to exclude sinking funds from the payment of the expenses of revaluation.